UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No.: 19-10080-NMG |
| | ) |
| MARCI PALATELLA, | ) |
| | ) |
| | ) |
| Defendant | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The government submits this memorandum in connection with the sentencing of defendant Marci Palatella. The parties have entered into a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), and, for the reasons set forth below, the government respectfully requests that the Court impose the agreed-upon disposition: a six-week term of imprisonment; a 24-month term of supervised release, including six months of home confinement and 500 hours of community service; and a $250,000 fine.

**I.      THE OFFENSE CONDUCT**

The Court is by now familiar with the facts of this case. *See generally* PSR ¶¶ 24–65. The defendant conspired with William "Rick" Singer and others to commit honest services mail fraud by agreeing to (1) cheat on her son's SAT exam and (2) secure her son's admission to the University of Southern California ("USC") as a fake football recruit. *Id.* ¶ 42. As part of the scheme, Palatella made payments totaling $575,000, styled as "donations," to Singer's sham charity, the Key Worldwide Foundation ("KWF"), and to a USC athletic fund overseen by corrupt senior women's athletics administrator Donna Heinel.

A. **SAT Cheating**

Beginning in 2016, the defendant agreed to pay Singer $75,000 to arrange for co-conspirator Mark Riddell to pose as a proctor for her son's SAT exam and secretly correct his answers to inflate his score. *Id.* ¶ 43. First, Singer arranged for Palatella's son to be evaluated by a psychologist with whom Singer was acquainted in order to obtain the medical documentation necessary to qualify for extended time on his college entrance exams. *Id.* ¶ 44. Palatella then coordinated with Singer to apply for extended time on both the SAT and ACT, and she later canceled her son's scheduled PSAT to avoid any discrepancy between a low PSAT score and a higher SAT score obtained through cheating. *Id.* ¶¶ 46–47. After her son was granted extended time on the SAT, Palatella told her son's high school that he would be taking the exam at West Hollywood College Prep, one of the two test centers controlled by Singer. *Id.* ¶ 48.

In March 2017, just a few days prior to her son taking the SAT at West Hollywood College Prep, Palatella caused her company to wire $75,000 to KWF. *Id.* ¶ 49. After Palatella's son completed the exam, Riddell reviewed and corrected his answers, ultimately obtaining a score of 1410 out of a possible 1600 on his behalf. *Id.* ¶¶ 50–51. After her son received that score, Palatella falsely bragged to a counselor at her son's high school, "Thank you! I cried my heart out. [My son], with the perfect environment, full accommodations . . . and medicated, he is really smart!! . . . [H]e worked so hard for this." *Id.* ¶ 52.

B. **The "Side Door"**

At approximately the same time that Palatella made arrangements with Singer to facilitate cheating on her son's SAT exam, she also agreed with Singer to secure her son's admission to USC as a football recruit based on falsified credentials. *Id.* ¶ 53. In March 2016, Singer emailed Palatella an assessment of her son's chances of admission to various schools, including USC, "with

2

the fudging of the scores." *Id.* ¶ 45. In a separate email chain, Singer asked Palatella, "Are you willing to make a contribution of several hundred thousand as a donation to get him in as a participant in someone's program?" *Id.* ¶ 55. Palatella responded, "Money for the right environment, Yes. But he can never know." *Id.*

In July 2017, Palatella emailed Singer a photo of her son – who played football on his high school's junior varsity team during his sophomore year but did not play football during his junior year – in his JV football uniform and asked, "Will this work?" *Id.* ¶¶ 54, 59. Singer forwarded the photo, along with Palatella's son's fraudulently obtained SAT score, to co-conspirator Laura Janke, who created an athletic profile for Palatella's son that contained the fraudulent score and falsely described him, among other things, as an active player on his high school football team and a member of several local and statewide championship teams. *Id.* ¶ 59.

Several months later, Palatella asked Singer whether certain schools would be "realistic" for her son assuming that he had "SAT scores that you can guess at (I'm assuming fairly accurately) . . . if we were also 'generous'?" *Id.* ¶ 56. Singer responded that absent a multi-million-dollar donation, "[t]he only way in is through athletics due to the leeway given athletes." *Id.* Palatella told Singer that her son was not qualified to be a football recruit, noting that he "took a year off football this year" and had "gotten the message that he is not big enough for college football." *Id.* ¶ 57. Singer replied to Palatella, stating, "He needs to get in through Football so my relationship at that level gives [him] a shot since that is the sport with the lowest grades[,]" and later, "I got it covered no worries on the story for [your son]." *Id.* ¶ 58.

In November 2017, Heinel presented Palatella's son to the USC subcommittee for athletic admissions, and based on falsified athletic credentials, obtained the subcommittee's approval to admit him to USC as a football recruit. *Id.* ¶ 60. Heinel emailed Singer the conditional admission

letter for Palatella's son, which stated that he had the "potential to make a significant contribution to the intercollegiate athletic program," and Singer forwarded the letter to Palatella. *Id.* Shortly thereafter, in December 2017, Palatella caused a check to be mailed to Heinel in the amount of $100,000, payable to the USC Women's Athletic Board, with a note that said, "Our son . . . is beyond thrilled at the prospect of attending USC as a freshman this fall." *Id.* ¶ 61. After USC mailed Palatella's son his formal acceptance letter in March 2018, Palatella made a $400,000 payment to KWF. *Id.* ¶ 62.

Acting at the direction of law enforcement in October 2018, Singer told the defendant during a consensually recorded phone call that the IRS was conducting an audit of KWF. *Id.* ¶ 63. During the call, Palatella agreed to mislead the IRS if anyone inquired about her payments to KWF, and even suggested that Singer should not "go down the [Riddell] road" with the IRS. *Id.*

In a January 2019 text message exchange with a friend regarding the money she paid to KWF for her son's admission to USC, Palatella wrote, "I don't think most of it went to the school between us only. Please never ever repeat anything." *Id.* ¶ 64. The next day, Palatella called Singer to tell him that that friend, after promising "she wouldn't say anything," had told Palatella's son that Palatella "basically paid off to get in." *Id.* ¶ 65. During that call, the defendant told Singer that she and her spouse "laugh every day" about how grateful they were for Singer's services, telling him, "We're like, 'it was worth every cent.'" *Id.*

## II.  **SENTENCING RECOMMENDATION**

Despite her compelling personal circumstances, namely the significant medical issues involving members of her immediate family, the seriousness of the defendant's crime and her deep involvement in both aspects of the scheme justify a sentence of incarceration. Palatella not only paid $75,000 in exchange for having Singer facilitate cheating on her son's SAT exam, but also

4

paid half a million dollars for Singer to secure her son's admission to USC as a purported athletic recruit based on falsified credentials.

Moreover, the defendant was an active participant in the scheme. She coordinated with Singer at every turn, arranging for her son to obtain extended time on the SAT and ACT, canceling his PSAT in an effort to avoid detection, and moving his exam location from his own high school to the facility controlled by Singer. The emails described above – with Palatella's references to "the fudging of the scores" and "SAT scores that you can guess at (I'm assuming fairly accurately)" – as well as her suggestion to Singer that he not mention Riddell to the IRS, demonstrate the defendant's insight into the test cheating aspect of the scheme.

Similarly, the defendant was fully aware that Singer had an insider at USC who was facilitating her son's admission as a football recruit despite the fact that he was not qualified to play football at the collegiate level. Palatella took active steps in furtherance of the side door aspect of the scheme as well, sending Singer a photo of her son in a football uniform for the athletic profile created by Janke, and mailing a check directly to Heinel with a note referencing her son's conditional admission.

Further, Palatella's communications with the counselor at her son's high school regarding his SAT score, with her friend regarding the money she paid to KWF for her son's admission to USC, and with Singer show the brazen nature of the defendant's conduct and her cavalier attitude toward it.

The government nevertheless acknowledges the severity of the medical issues affecting members of the defendant's immediate family, and her significant role in caring for those family members. *See* PSR ¶¶ 104, 106. In light of those issues, the government submits that the agreed-upon disposition – which includes six weeks of incarceration and 6 months of home confinement

in lieu of additional incarceration, as well as 500 hours of community service – is sufficient to provide just punishment, promote respect for the law, and deter this defendant and others, while also accounting for the defendant's personal circumstances.

Finally, the agreed-upon disposition reflects the statutory interest of imposing comparable sentences for similarly situated defendants. In addition to the examples set forth in the government's sentencing memorandum for defendant Elisabeth Kimmel (*see* Dkt. 2452 at 7), the sentence imposed by this Court on Kimmel herself provides an apt comparison. Kimmel was sentenced to six weeks in prison, two years of supervised release with conditions of home confinement for the first 12 months of supervised release and 500 hours of community service, and a $250,000 fine. Like Palatella, Kimmel participated in the scheme twice – once to secure her daughter's admission to Georgetown University as a purported tennis recruit and once to secure her son's admission to USC as a phony track and field recruit – and her agreed-upon sentence likewise took into account unique medical considerations. The longer term of home confinement for Kimmel reflects the fact that she engaged in the side door aspect of the scheme twice, for two of her children, over a seven-year period, whereas Palatella participated in both the side door and test cheating aspects of the scheme once, for one child, over a shorter period of time.

As the government has previously noted, this Court has imposed a sentence requiring as many as 500 hours of community service for only one other defendant in this case,[1] and, aside from Kimmel's 12-month term, six months is the longest period of home confinement for any defendant who has also served time in prison in this case or related cases.[2] Accordingly, the

---

[1] *See United States v. Hodge*, 19-cr-10080-NMG-11 (500 hours of community service).

[2] *See United States v. Vandemoer*, 19-cr-10079-RWZ (one day time-served of incarceration and six months of home confinement); *United States v. Fox*, 19-cr-10081-IT-7 (three months of

government submits that these aspects of the proposed disposition, when combined with the term of incarceration, contribute to a sentence that, as a whole, appropriately balances the considerations set forth in Section 3553(a).

## III. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court accept the defendant's Rule 11(c)(1)(C) guilty plea and impose the agreed-upon sentence: six weeks of incarceration; 24 months of supervised release, with conditions of home confinement for the first six months of supervised release and 500 hours of community service; and a statutory-maximum fine of $250,000.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: */s/ Leslie A. Wright*
KRISTEN A. KEARNEY
LESLIE A. WRIGHT
STEPHEN E. FRANK
IAN J. STEARNS
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Leslie A. Wright*
LESLIE A. WRIGHT
Assistant United States Attorney

---

incarceration and three months of home confinement); *United States v. Dameris*, 20-cr-10099-RGS (one day time-served incarceration and 12 months home confinement).